**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| PRIMORIS ENERGY SERVICES CORPORATION, PRIMORIS INDUSTRIAL CONSTRUCTORS, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 25-CV-11880-AK |
| A/Z CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER ON PETITION TO VACATE ARBITRATION AWARD, STAY OF ENFORCEMENT, AND STAY OF PROCEEDINGS AND MOTION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF FINAL JUDGMENT**

**ANGEL KELLEY, D.J.**

Plaintiff Primoris Energy Services Corporation, Primoris Industrial Constructors ("Plaintiff" or "Primoris") brings the instant Petition to Vacate Arbitration Award, Stay of Enforcement, and Stay of Proceedings ("Petition") seeking to vacate an arbitral award issued against it in favor of Defendant A/Z Corporation ("Defendant" or "A/Z"). [Dkt. 1]. Primoris asserts that the award exceeded the scope of the arbitrator's authority and violates public policy. [See id.]. A/Z opposes the Petition and has concurrently filed a Motion to Confirm Arbitration Award and for Entry of Final Judgment ("Motion to Confirm"). [Dkt. 19]. For the reasons set forth below, Plaintiff's Petition to Vacate Arbitration Award [Dkt. 1] is **DENIED**. Defendant's Motion to Confirm Arbitration Award [Dkt. 19] is **STAYED** pending the resolution of a motion for reconsideration filed in the underlying arbitration.

1

## I.    BACKGROUND

The following facts, which are largely undisputed, are taken from the Parties' submissions and the documents cited therein.  Primoris is a Texas-based critical infrastructure and utility services company. [Dkt. 1 ¶ 1].  One of Primoris' subsidiaries, OnQuest, Inc., was hired as a contractor by Hopkinton LNG Corp. to complete an electric installation project in Hopkinton, Massachusetts. [See Dkt. 1-6].  The parties executed a contract on February 6, 2017, to capture the terms of their agreement ("Prime Contract"). [Id. at 1].  Primoris, in turn, engaged A/Z, a construction design firm based in Connecticut, as a subcontractor for the project. [Dkts. 1 ¶ 2; 1-1 at 4].  On December 31, 2019, the Parties executed a subcontract agreement ("Subcontract") to set out the terms of the engagement. [Dkts. 1-1 at 4; 1-5].  The Subcontract incorporates the terms of the Prime Contract between Primoris' subsidiary and Hopkinton LNG Corp. [See Dkt. 1-5, Section I ("Subcontractor shall be bound to the same extent that Contractor is bound by each and every covenant, obligation, and provision of the Prime Contract insofar as the same is applicable to the work of Subcontractor.")].  The Subcontract contains special provisions that the Parties "expressly agreed [are] a part of th[e] Subcontract Agreement and binding upon the parties." [Dkt. 1-5, Section IV].

The Subcontract and Prime Contract (together, "Contracts") established procedures by which A/Z could request changes to the project budget or other contractual terms.  A simplified, high-level summary for purposes of this Order is as follows: first, A/Z must submit a "Change Order Request" for "any change to the Work, the Fixed Contract Price, the Work Schedule and/or any other terms and/or conditions under the Contract Documents." [Dkt. 1-6 at 2-5 (definitions for "Agreed Change Order," "Change Order," "Change Order Request," "Directed Change," and "Directed Change Order")].  Next, Primoris reviews the request and either approves or rejects it.

[See Dkt. 1-1 at 5]. As A/Z completed work, A/Z could submit an application for payment, and Primoris was required to pay any approved Change Orders included in the application. [See id.].

### A.    Relevant Prime Contract and Subcontract Terms

The Contracts contain provisions providing for the arbitration of disputes arising between the Parties. In the Prime Contract, the primary provisions are Article 16.3 ("Arbitration") and 16.4 ("Powers of Arbitrator(s)"). Article 16.3 provides generally that disputes arising out of the Contracts must proceed by arbitration:

> Any Dispute arising out of or relating to the Contract Documents, including the breach, termination or validity thereof, and/or the Work, that has not been resolved by a non-binding procedure . . . shall be resolved by final and binding arbitration in accordance with the then current AAA Construction Industry rules by a sole arbitrator . . . . The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, inclusive, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof.

[Dkt. 1-6, art. 16.3]. Article 16.4 provides limitations on the types of remedies an arbitrator may issue. Specifically:

> Except to the extent provided for in Section 14.3 and subject to 14.2, the arbitrator(s) are not empowered to award damages in excess of compensatory damages . . . and each Party expressly waives and foregoes any right to punitive, exemplary or similar damages unless a statute requires that compensatory damages be increased in a specified manner.

[Dkt. 1-6, art. 16.4]. The referenced Article 14.2 of the Prime Contract ("Consequential Damages") states in relevant part:

> Except as set forth in Section 14.3,[1] neither Party shall be liable to the other Party for any indirect, incidental or consequential damages, including but not limited to, loss of revenue, loss of business, diminution in value, loss of profits, contribution to overhead or special or exemplary damages of any kind or character, regardless

---

[1] Section 14.3 of the Prime Contract ("Exceptions to Limitations on Contractor's Liability") excepts liquidated damages, intentional wrongful acts, indemnity obligations, and losses or damages covered by insurance from the waiver and are not relevant here. [Dkt. 1-6, art. 14.3].

of whether any such damages arise out of breach of contract or warranty, tort, product liability, indemnity, contribution, strict liability or other legal theory.

[Dkt. 1-6, art. 14.2].  In addition to this limitation on consequential damages, the Prime Contract

also contains a waiver for claims related to Change Orders.  Article 7.2(c) provides:

> To the extent that any Change Order increases the Fixed Contract Price and/or extends the Work Schedule, such price increase and/or time extension set forth in such Change Order shall be full compensation to Contractor for all costs and delays, direct and indirect, incurred by Contractor in connection with the conditions giving rise to such Change Order, the Work specified therein, and any resulting costs, delays or effects on unchanged Work resulting therefrom.  Contractor . . . agrees that such Change Order is a full accord and satisfaction as to any amounts and time extensions in any way related to the period or causes of delay which are included as or related in any way to the subject or scope of such Change Order, and Contractor irrevocably waives, discharges and releases Owner . . . from any and all claims, liabilities, demands, entitlements, and damages whatsoever, known or unknown, in connection with or in any way related to such Change Order, its subject matter, or causes of delay relating thereto, including any further time extensions, any costs, expenses or damages for delay, overhead, profit, mark-up of any kind or loss of productivity.

[Dkt. 1-6, art. 7.2(c)].

The Subcontract contains similar arbitration provisions as the Prime Contract.  Article 16.2 provides, in relevant part:

> [E]xcept as to any matter which has been waived by or conclusively determined pursuant to other terms of this Subcontract, Contractor and Subcontractor shall arbitrate any and all claims, disputes, and other matters in question arising out of, or relating to, this Subcontract, or the breach thereof, in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining.

[Dkt. 1-5, Ex. D ¶ 25].  Article 32, in turn, waives claims for consequential damages:

> Subcontractor and Contractor waive any and all claims against each other for incidental, consequential, special, multiple, and punitive damages arising out of or

4

relating to this Contract, regardless of whether such damages were foreseeable and whether or not the culpable party was advised of the possibility of such damages.

[Id. ¶ 37].

### B.      The Dispute

On or around April 20, 2020, Hopkinton LNG Corp. introduced various new design changes and drawings to the project that resulted in a significant expansion in A/Z's scope of work. [Dkt. 1-1 at 4].  Primoris directed A/Z to reprice the contract to account for these changes. [Id.].  In particular, Primoris allegedly expressly instructed A/Z to include "any and all additional costs, including, but not limited to any possible inefficiencies or other related impacts to the Project and any other costs, incurred or to be incurred by A/Z, to complete the Project." [Id.].  In response, A/Z submitted Change Order Request #15 on September 21, 2020, requesting a total change of $3,920,010. [See Dkt. 1-8].  Primoris executed Change Order Request #15 on or around September 21, 2020. [Dkt. 1-1 at 4].

Following the execution of Change Order Request #15, A/Z submitted various additional Change Order Requests, many of which Primoris approved. [See id. at 5].  Primoris alleges these were "comprised mainly of extended general conditions costs" and "additional labor and materials," which "were submitted on a time and materials basis ('T&M') from September 2021 through April 2022." [Id.].  A/Z substantially completed its work on the project by January 2022 and demobilized on or around May 5, 2022. [Id. at 6].

Two Change Order Requests submitted after Change Order Request #15 are the subject of dispute in this case.  By June 16, 2022, after A/Z had completed its work and demobilized, A/Z had submitted Change Order Requests #66 and #104, seeking payment through an application for payment ("Payment Application #28") [Dkts. 1-18; 1-19].  The Change Order Requests sought compensation for alleged "costs associated with loss of productivity due to

5

cumulative and concurrent impacts to the project," including "[e]xcessive change orders," "[e]quipment not available," "[s]patial constraints," "[b]uildings left open to weather," "[d]ilution of supervision," and other factors. [Dkts. 1-18 at 4; 1-19 at 4]. The Change Order Requests sought payment in the amounts of $2,216,923.70 and $108,673.30, respectively, and referenced letters that A/Z had previously sent to Primoris on February 15, 2021, and September 17, 2021, requesting payment for the same work. [Dkts. 1-1 at 6; see 1-18 at 1, 4-7; 1-19 at 1, 4-7]. Primoris rejected both the two letters and Payment Application #28, asserting that A/Z's loss-of-productivity calculations were flawed and that Change Order Request #15 encompassed all additional costs associated with the new drawings, thereby precluding recovery under Change Order Requests #66 and #104. [Dkt. 1-22].

### C.    Arbitration

Pursuant to the arbitration clauses in the Contracts and the Federal Arbitration Act ("FAA"), A/Z filed a demand for arbitration against Primoris on September 3, 2024, regarding Primoris' rejection of Payment Application #28. [Dkt. 1-26]. On April 22, 2025, A/Z moved for summary judgment, asserting that Primoris failed to certify that its rejection was made in good faith, as required under the Massachusetts Prompt Payment Act. [Dkt. 17-1, Ex. 2 at 8-11]; Mass. Gen. Laws ch. 149, § 29E (2010). A/Z also contended that Primoris was not permitted to raise defenses until the Payment Application was paid, which it had not done. [Dkt. 17-1, Ex. 2 at 11-12]. Primoris raised multiple arguments in its defense, primarily arguing that the Massachusetts Prompt Payment Act did not apply to Payment Application #28 because it fell outside the Act's scope. [See Dkts. 17-1, Ex. 6; 24-2]. An oral argument on the motion was held on May 28, 2025. [Dkt. 1-1 at 7]. At the hearing, the Arbitrator allegedly expressed concern regarding whether he

had authority under the arbitration provisions of the Contracts to issue an award on these claims; however, the Parties did not further brief or address this issue with the Arbitrator. [Id.].

On June 6, 2025, the Arbitrator granted summary judgment in favor of A/Z. [Dkt. 1-30]. As a threshold matter, the Arbitrator noted that the Parties "agreed to arbitrate all disputes arising from their agreement, including the dispute arising from Payment Application # 28." [Id. at 1]. On the merits, the Arbitrator analyzed recent Massachusetts caselaw to conclude that the Massachusetts Prompt Payment Act applied to Payment Application #28. [Id. at 2 (citing Tocci Bldg. Corp. v. IRIV Partners, LLC, 101 Mass. App. Ct. 133 (2022); Bus. Interiors Floor Covering Bus. Tr. v. Graycor Constr. Co. Inc., 494 Mass. 216 (2024); J.C. Cannistaro, LLC v. Colum. Constr. Co., No. 2082-CV-00738 (Norfolk Sup. Ct. Dec. 4, 2024))]. The Arbitrator expressly found that Payment Application #28 constituted a "periodic progress payment" subject to the Act, and that nothing in the Act limits the types of damages recoverable in a periodic payment application, including consequential damages. [Id. at 3-4]. Because Primoris conceded that it had neither paid the invoice nor certified its rejection was in good faith, the Arbitrator determined that Primoris waived any defenses. [Id. at 2, 4]. Accordingly, the Arbitrator granted summary judgment in favor of A/Z and issued an Interim Award in the amount of $2,325,597, plus 12% annual interest. [Id. at 7].

### D.    Procedural Background

On July 1, 2025, Primoris filed a Petition to Vacate the Arbitration Award, Stay of Proceedings, and Stay of Enforcement in this Court. [Dkt. 1]. A/Z filed an Opposition [Dkt. 17-4], to which Primoris filed a Reply [Dkt. 28]. In parallel, Primoris filed a motion for reconsideration with the Arbitrator on July 1, 2025 [Dkt. 24-3], to which A/Z filed an opposition. [Dkt. 29-1, Ex. 4]. Shortly thereafter, the Parties were notified by the American Arbitration

Association that the Arbitrator had withdrawn from the matter due to personal reasons, and a new arbitrator was appointed. [Dkt. 24-4].  In addition to opposing the Petition to Vacate, A/Z filed a Motion to Confirm Arbitration Award and for Entry of Final Judgment on July 22, 2025. [Dkt. 19].  Primoris filed an Opposition [Dkt. 24], to which A/Z filed a Reply. [Dkt. 29].  On August 28, 2025, following a status conference with the Parties, the new Arbitrator stayed the motion for reconsideration in the underlying arbitration pending this Court's decision on the Petition to Vacate. [Dkt. 29-1, Ex. 10].

## II.    LEGAL STANDARD

As a general matter, judicial review of an arbitrator's ruling "is extremely narrow and exceedingly deferential, and is indeed among the narrowest known in the law." Raymond James Fin. Servs., Inc. v. Fenyk, 780 F.3d 59, 63 (1st Cir. 2015) (citations and internal quotation marks omitted); see also Teamsters Loc. Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 61 (1st Cir. 2000) ("[D]isputes that are committed by contract to the arbitral process almost always are won or lost before the arbitrator.  Successful court challenges are few and far between.").  As the Supreme Court has explained, this limited judicial review "maintain[s] arbitration's essential virtue of resolving disputes straightaway." Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 588 (2008).  If parties could take "full-bore legal and evidentiary appeals," arbitration would become "merely a prelude to a more cumbersome and time-consuming judicial review process." Id. (quoting Kyocera Corp. v. Prudential-Bache Trade Servs., Inc., 341 F.3d 987, 998 (9th Cir. 2003)).

There are three grounds on which a court can vacate an arbitration award.  First, Section 10(a) of the FAA authorizes vacatur in "cases of 'specified misconduct or misbehavior on the arbitrators' part, actions in excess of arbitral powers, or failures to consummate the award.'"

Hoolahan v. IBC Advanced Alloys Corp., 947 F.3d 101, 111 (1st Cir. 2020) (quoting Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 32 (1st Cir. 2006)).  In challenging the arbitrability of a dispute pursuant to Section 10(a), a party does not seek review of the merits of the arbitrator's decision; rather, the inquiry is limited to "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002).  Such questions of arbitrability are "presumptively for courts to decide" absent "clear and unmistakable evidence" that the parties delegated that question to the arbitrator. Ribadeneira v. New Balance Athletics, Inc., 65 F.4th 1, 19 (1st Cir. 2023) (internal quotation marks omitted); Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 n.2 (2013); see also PaineWebber, Inc. v. Elahi, 87 F.3d 589, 599 (1st Cir. 1996).  Courts thus review questions of arbitrability de novo. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995); PaineWebber, 87 F.3d at 592.  However, because of the strong federal policy favoring arbitration, courts resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985).

In addition to the statutory grounds for vacatur under FAA Section 10(a), the First Circuit recognizes a common law ground for vacatur in cases "where the arbitrator acts with 'manifest disregard of the law.'" Marks v. Wells Fargo Advisors, LLC, No. CV 25-12506, 2026 WL 457749, at *2 (D. Mass. Feb. 18, 2026) (quoting Mountain Valley Prop., Inc. v. Applied Risk Servs., Inc., 863 F.3d 90, 94-95 (1st Cir. 2017)).  Similarly, a party may raise a public policy ground for vacatur, under which a court "may vacate an arbitration award if it violate[s] an explicit . . . well defined and dominant public policy, as ascertained by reference to . . . laws and legal precedents." Unión Internacional UAW, Loc. 2415 v. Bacardí Corp., 8 F.4th 44, 51 (1st Cir.

2021) (alterations in original) (internal quotation marks omitted) (quoting Mercy Hosp., Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 343 (1st Cir. 2005)).

### III.    DISCUSSION

In its Petition, Primoris raises three challenges to the arbitration award: (1) the Arbitrator exceeded the scope of his authority under the arbitration provisions, which is a ground for vacatur under FAA Section 10(a)(4); (2) the Arbitrator acted in manifest disregard of the law by misinterpreting the Massachusetts Prompt Payment Act; and (3) the award violates public policy because it constitutes a forfeiture. [Dkt. 1].  A/Z contends that Primoris waived any jurisdictional challenges by not presenting such challenges to the Arbitrator. [Dkt. 17-4].  The Court considers each argument in turn.

### A.    Waiver of Jurisdictional Challenge

Before evaluating the merits of Primoris' Petition, the Court addresses A/Z's argument that Primoris waived any challenge to the Arbitrator's jurisdiction by failing to raise it during the underlying arbitration.  When a party moves to vacate an arbitration award for lack of arbitral jurisdiction, the objection "must be made on a timely basis, or it is waived." Ribadeneira, 65 F.4th at 15 (quoting ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc., 102 F.3d 677, 685 (2d Cir. 1996)).  The First Circuit, as well as other circuits, has held that "a jurisdictional objection comes too late if it is only raised after the arbitrator has ruled on the merits." Id. (citing OJSC Ukrnafta v. Carpatsky Petrol. Corp., 957 F.3d 487, 498 (5th Cir. 2020); Env't Barrier Co., LLC v. Slurry Sys., Inc., 540 F.3d 598, 607 (7th Cir. 2008); Pa. Power Co. v. Loc. Union No. 272 of the Int'l Bhd. of Elec. Workers, 886 F.2d 46, 50 (3d Cir. 1989); Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1357 (9th Cir. 1983)).  Instead, to properly preserve a jurisdictional challenge, a party should "make her position known to the arbitrator and the other

10

party" at the outset; the opposing party may then, "if it wishes, respond with a petition for an order to compel arbitration under [FAA Section 4], and obtain a judicial determination on arbitrability." Env't Barrier, 540 F.3d at 606 (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983)).

The First Circuit explained that the rule is grounded in several important policy considerations. First, it "prevents inefficiency and . . . gamesmanship" by preventing parties from "wait[ing] to see how the arbitration tribunal rule[s] before deciding whether to challenge its jurisdiction." Ribadeneira, 65 F.4th at 15-16 (quoting Ukrnafta, 957 F.3d at 498); see also Env't Barrier, 540 F.3d at 606 (noting that such a "wait-and-see approach" is "not a tactic [the court] can accept, for sound policy reasons"); Ficek v. S. Pac. Co., 338 F.2d 655, 657 (9th Cir. 1964) (similar). Second, it promotes judicial efficiency, as "vacating an arbitrator's decision for lack of jurisdiction after the pursuit of discovery, the submission of briefs, and the holding of hearings would be 'terribly wasteful of the arbitrator's time, the parties' time, and the court's time.'" Id. at 16 (quoting Env't Barrier, 540 F.3d at 606). Third, it would be "unfair to the other parties to the arbitration who had shouldered the effort and expense of the arbitration proceedings until their conclusion, only to find that they still face the risk of having to relitigate the same issues in a judicial forum." Id.

The First Circuit has "decline[d] to articulate any bright-line rule" on when an objection is untimely, instead directing courts to undertake a "fact-specific inquiry." Id. For example, the First Circuit has found a jurisdictional challenge preserved when it was raised "soon after [the party] was added as a respondent, before the close of discovery and before any hearings on the merits." Id. at 16-17 (finding that moving parties properly preserved objections by expressly including jurisdictional objections in initial response, filing within two weeks, and reiterating

11

challenge in motion for summary judgment).  By contrast, objections raised "for the first time"

on appeal in a petition to vacate, "only after the arbitrator issued a decision that [a party] did not

agree with," are more likely to be deemed waived. Pilgrim's Pride Corp. v. Diaz, No. 22-CV-

04413, 2024 WL 1051320, at *6 (D.S.C. Mar. 11, 2024) (citing, inter alia, Ribadeneira, 65 F.4th

at 15).

On the facts before it, the Court finds that Primoris failed to properly preserve its

jurisdictional challenge.  A/Z filed a demand for arbitration on September 3, 2024.  Over the

course of the next nine months, Primoris made four filings: an answering statement on

September 23, 2024 [Dkt. 17-2, Ex. 1-D]; a renewed answering statement on January 10, 2025

[id., Ex. 1-F]; an opposition to A/Z's motion for permission to file a motion for summary

judgment on February 7, 2025 [see Dkts. 28 at 3 n.5; 17-2, Ex. 6 at 2]; and an opposition to

A/Z's motion for summary judgment on May 15, 2025 [Dkt. 17-2, Ex. 6].  Primoris also

participated in oral argument on the summary judgment motion on May 28, 2025.[2]  As Primoris

concedes, in none of these five opportunities across nine months did Primoris expressly raise a

jurisdictional objection to the Arbitrator. [See Dkt. 28 at 4].

The Court does not necessarily infer that Primoris engaged in intentional gamesmanship;

it is possible that the jurisdictional challenge may not have become apparent to Primoris until the

Arbitrator raised it during oral argument. [See id. (acknowledging that Primoris "was still in the

process of evaluating" the extent and nature of A/Z's claims when responding to A/Z's summary

---

[2] Primoris contends that the Arbitrator did consider the issue because he allegedly questioned his
authority during oral argument.  Even so, however, Primoris did not further brief or discuss the
issue.  Primoris alleges that the Arbitrator "declined the permission to argue or submit briefing
on this issue prior to issuing the Award." [Dkt. 28 at 2].  However, as there is no transcript of the
proceeding, it is presently unclear whether Primoris requested to brief the issue and was denied,
or the Arbitrator simply did not request further briefing sua sponte. [Id. at 3 n.5].  If the latter,
Primoris cannot claim that it intentionally raised the issue to the Arbitrator.

judgment motion and realized that "[a]rbitrability became an objectionable issue" only "when the Award was issued")]. Nonetheless, the Court is concerned about the efficiency and fairness of allowing Primoris to pursue these arguments at this stage. Primoris' current objections largely recast its prior merits arguments—such as challenges to consequential damages and payments covered under Change Order Request #15—as a challenge to arbitrability, which suggests a desire to re-litigate the merits rather than truly contesting jurisdiction. Indeed, given the late stage of the proceedings and the extensive briefing below, where Primoris apparently submitted to the Arbitrator's jurisdiction, it seems that "if [Primoris] had liked [the Arbitrator's] decision, it would have remained silent, but since it did not, it is now complaining about arbitrability." Env't Barrier, 540 F.3d at 606. The record before the Court already exceeds 2,500 pages. Further briefing on this topic would be inefficient and wasteful of resources already expended. Accordingly, the Court finds that any jurisdictional challenges to the Arbitrator's authority are waived.

### B.     FAA Section 10(a)(4)

Even assuming Primoris' jurisdictional challenges were preserved, the Court finds that Primoris has not demonstrated that the Arbitrator exceeded the scope of his authority. Primoris contends that the Contracts exclude from arbitration both consequential damages and payments related to Change Order Request #15. The Court disagrees that these arguments meet the high bar required to overcome the presumption in favor of arbitrability.

In general, scope-of-arbitration clauses are like any other contract, and so courts apply principles of state contract law in interpreting them. See First Options of Chi., 514 U.S. at 944; PaineWebber, 87 F.3d at 592. However, because of the strong federal policy in favor of arbitration, courts resolve "any doubts concerning the scope of arbitrable issues . . . in favor of

13

arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Mitsubishi Motors, 473 U.S. at 626 (quoting Moses H. Cone Mem'l Hos., 460 U.S. at 24-25).  In the context of motions to compel arbitration, which the Court finds instructive in this context,[3] ambiguous or broadly worded scope-of-authority provisions carry not just a preference but a "presumption in favor of arbitration." Grand Wireless Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 7-8 (1st Cir. 2014) (emphasis added) (citing Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d, 367, 379 (1st Cir. 2011)).  To overcome that presumption, the movant has the burden of showing with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." First Sealord Sur., Inc. v. TLT Const. Corp., 765 F. Supp. 2d 66, 72-73 (D. Mass. 2010) (quoting Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 20 (1st Cir. 2000)).

### 1.    Consequential Damages

Primoris contends that the funds sought in Payment Application #28 constitute consequential damages, which are expressly excluded from the arbitration provisions of the Contracts.  In particular, Primoris highlights Article 16.2 of the Subcontract, which provides that the Parties "shall arbitrate any and all claims, disputes, and other matters . . . arising out of, or relating to [the Subcontract] except as to any matter which has been waived by or conclusively determined pursuant to other terms of" the Subcontract.  Article 32 of the Subcontract in turn

---

[3] In particular, the Court finds that the presumption in favor of arbitrability is even stronger in the context of a motion to vacate an arbitration award than in the context of a motion to compel arbitration.  In the former, the parties and the arbitrator have already expended significant resources and reached a decision on the merits of a dispute.  Such concerns of inefficiency and waste, which are not yet present in the posture of a motion to compel, weigh heavily in favor of declining to disturb the arbitrator's award.

"waive[s] any and all claims for incidental, consequential, special, multiple, and punitive damages arising out of or relating to this Contract."  Primoris contends that Payment Application #28 is excepted from the arbitration provision in Article 16.2 because it constitutes consequential damages under Article 32.  Similarly, Article 16.4 of the Prime Contract provides that "subject to 14.2, the arbitrator(s) are not empowered to award damages in excess of compensatory damages."  The referenced Article 14.2 states that "neither Party shall be liable to the other Party for indirect, incidental, or consequential damages, including but not limited to, loss of revenue, loss of business, diminution in value, loss of profits, contribution to overhead or special or exemplary damages of any kind or character."  Primoris argues that, as with Article 16.2 of the Subcontract, this provision of the Prime Contract excludes consequential damages—here serving as a limit on remedial authority, rather than as a restriction on the scope of claims the Arbitrator may hear.

Because Primoris' argument turns on the characterization of the damages at issue, the Court first addresses the distinction between direct and consequential damages under Massachusetts contract law.  Direct damages are "the natural and probable consequences of the breach, that is, those arising naturally according to the usual course of things, from such breach of contract itself."  In re LastPass Data Sec. Incident Litig., 742 F. Supp. 3d 109, 126 (D. Mass. 2024) (quoting Boylston Hous. Corp. v. O'Toole, 321 Mass. 538 (1947)).  By contrast, consequential damages are "damages that do not arise naturally or ordinarily from a breach of contract, but which arise because of the intervention of special circumstances."  Id. at 127 (citing Chestnut Hill Dev. Corp. v. Otis Elevator Co., 739 F. Supp. 692, 701 (D. Mass. 1990)); see also Mass. Gen. Laws ch. 106, § 2-715(2) (defining consequential damages as "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting

15

had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty."). To distinguish between the two types of damages, courts look to whether the damages "depend on the future action of any third party." Atlantech Inc. v. Am. Panel Corp., 743 F.3d 287, 293 (1st Cir. 2014). If they do, they are more likely to be consequential, rather than direct, damages.[4] See id.

Here, the Court concludes that the damages at issue are properly characterized as direct. Primoris concedes that Payment Application #28 seeks compensation for "material, subcontract, equipment, supplies, and general conditions cost types." [Dkt. 24-2 at 10]. The underlying Change Order Request #66 and #104 itemize expenses such as newly purchased equipment required to complete the work, costs associated with spatial constraints and blockages, winter conditions necessitating more frequent work interruptions, difficult-to-manipulate cables, and the administrative burden of excessive Change Orders. [Dkt. 1-9]. The most significant line-item consists of cables, listed at approximately $1.2 million out of the approximately $2.4 million total sought. [See id. at 18]. These categories of costs arise directly from A/Z's performance on the project itself. They do not "depend on the future action of any third party." Atlantech, 743 F.3d at 293. Nor do they reflect generalized losses such as reputational harm, diminished net

---

[4] As examples, courts in this circuit have characterized damages as direct where they consist of "[c]osts to mitigate the misuse of customers' data" following a security breach under a contract specifically providing for data security, LastPass, 742 F. Supp. 3d at 127, as well as interest-carrying charges on financing charges associated with construction loans, Chestnut Hill, 739 F. Supp. at 703. By contrast, courts have found damages to be consequential where a party sought lost profits from the anticipated sale of a product, reasoning that such profits depended on "future deals with a business that is not a party to [the contract] and are contingent on anticipated prices and demand that are not determined by the contract itself." Atlantech, 743 F.3d at 294. Other cases characterizing damages as consequential include a landlord losing rental income due to delays in the installation of elevators in an apartment under a construction contract, Boylston, 321 Mass. at 563, and where a company's general ability to meet its financial obligations was impaired by an aggressive project schedule, Turner Constr. Co. v. MJ Flaherty Co., No. SUCV201302308, 2017 WL 2218780, at *1 (Mass. Super. Mar. 8, 2017).

worth, or impaired ability to complete other work. See Turner Constr. Co., 2017 WL 2218780, at *1 (finding that a subcontractor's claim that project setbacks "adversely impacted" its ability to meet its overall financial obligations was a "paradigm claim for consequential damages"). Rather, they compensate A/Z directly for the equipment, materials, and other expenses incurred in fulfilling their contractual obligations. As such, they are more appropriately classified as direct, rather than consequential, damages. Accordingly, Primoris has not overcome the presumption in favor of arbitration. The Court therefore concludes that Payment Application #28 was not excluded from the scope of arbitration on the ground that it sought consequential damages.

### 2.    Duplicative Payments

In addition to its argument regarding consequential damages, Primoris contends that the work reflected in Payment Application #28 is duplicative of work previously covered by Change Order Request #15 and was therefore waived pursuant to Prime Contract Article 7.2(c). That Article provides that any claims in connection with an executed Change Order Request is waived. [Dkt. 1-6, art. 7.2(c) ("To the extent that any Change Order increases the Fixed Contract Price . . . such price increase . . . shall be full compensation to Contractor for all costs and delays, direct and indirect, incurred by Contractor in connection with the conditions giving rise to such Change Order, the Work specified therein, and any resulting costs, delays or effects on unchanged Work resulting therefrom. . . . Contractor irrevocably waives, discharges and releases Owner . . . from any and all claims, liabilities, demands, entitlements, and damages whatsoever, known or unknown, in connection with or in any way related to such Change Order, its subject matter, or causes of delay relating thereto, including any further time extensions, any costs, expenses or damages for delay, overhead, profit, mark-up of any kind or loss of productivity.")].

17

Primoris contends that Change Order Request #15 encompassed the entire repricing of the project resulting from the April 2020 design changes.  According to Primoris, the costs reflected in Payment Application #28 relate to the same time period and scope of work addressed in Change Order Request #15, and any additional claims for compensation arising from that work were therefore waived.  Primoris also asserts that Payment Application #28 is waived because it was untimely submitted. [Dkt. 1-1 at 14-15].

Primoris has not met its burden of overcoming the presumption in favor of arbitrability on this argument.  Primoris' position is premised on the notion that Change Order Request #15 fully repriced the project to account for all productivity impacts associated with the April 2020 design changes.  Yet Primoris acknowledges that, after Change Order Request #15 was executed, Primoris approved multiple new Change Order Requests submitted by A/Z. [Id. at 5].  Although Primoris contends that those payments are distinguishable from Payment Application #28 because those payments were "comprised mainly of extended general conditions costs" and "additional labor and materials" that "were submitted on a time and materials basis" [id.], Primoris does not adequately explain why those items were not duplicative of Change Order Request #15 but Payment Application #28 purportedly is.  Specifically, Payment Application #28 appears to include similar categories of costs (e.g., equipment, administrative costs, and materials) and may reflect events that were unanticipated at the time Change Order Request #15 was executed or that relate to impacts beyond the April 2020 design changes.

Even assuming the costs at issue are ultimately distinguishable from those other Change Order Requests, Primoris bears the burden of persuasion, and its unelaborated descriptions, without more developed support, are insufficient to carry that burden.  The Court is obliged to resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration,"

including "allegation[s] of waiver." Mitsubishi, 473 U.S. at 626.  Because the Court cannot say with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," it likewise cannot conclude that Primoris has overcome the strong presumption in favor of arbitration on this argument.  First Sealord Sur., 765 F. Supp. 2d at 72. Accordingly, in light of the limited factual clarity and the federal policy in favor of arbitrability, the Court finds that Payment Application #28 was not clearly waived by Change Order Request #15.

### C.      Manifest Disregard of the Law

Next, Primoris asserts that the arbitration award reflects a "manifest disregard of the law." Bangor Gas Co. v. H.Q. Energy Servs. (U.S.) Inc., 695 F.3d 181, 187 (1st Cir. 2012) (internal quotation marks omitted).  Under this doctrine, a court may vacate an award under its common law authority if it finds that the award is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact." Hoolahan, 947 F.3d at 119 (quoting Mountain Valley Prop., 863 F.3d at 95).  To make such a showing, there must be some evidence in the record, "other than the result obtained, that the arbitrators knew the law and expressly disregarded it." Advest, Inc. v. McCarthy, 914 F.2d 6, 10 (1st Cir. 1990) (quoting O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc., 857 F.2d 742, 747 (11th Cir. 1988)).  Notably, the First Circuit has questioned the survival of this ground for vacatur after Hall Street, where the Supreme Court "h[e]ld that [9 U.S.C. § 10] . . . provide[s] the FAA's exclusive grounds for expedited vacatur." Hall St., 552 U.S. at 584; Ramos-Santiago v. United Parcel Serv., 524 F.3d 120, 124 n.3 (1st Cir. 2008) (stating in dicta that "manifest disregard of the

law is not a valid ground for vacating or modifying an arbitral award in cases brought under the Federal Arbitration Act").

Regardless of the validity of this ground post-Hall Street, Primoris fails to demonstrate that the Arbitrator acted in manifest disregard of the law.  There is no indication in the Arbitrator's order that he "knew the law and expressly disregarded it." Advest, 914 F.2d at 10. Primoris contends that the Arbitrator knew, or should have known, that he lacked authority to hear the claims, as during oral argument, the Arbitrator allegedly questioned whether he had authority to hear the claims.  However, that fact alone does not support an inference that the Arbitrator recognized he lacked authority but proceeded anyway.  Indeed, an equally, if not more, plausible inference is that the Arbitrator concluded he did, in fact, have authority under the Contracts, and proceeded accordingly.

Primoris also contends that the Arbitrator misapplied the Massachusetts Prompt Payment Act.  However, this is a merits argument; Primoris does not suggest or provide evidence that the Arbitrator knowingly acted against the statute.  To the contrary, the Arbitrator's order demonstrates an effort to interpret the relevant statutory provisions governing periodic progress payments, as well as applicable state caselaw regarding the certification requirement. [Dkt. 1-30 at 2-3].  He then applied those authorities to determine whether Payment Application #28 falls within the language of the statute. Id.  The Arbitrator was not so divorced from the Contracts, the statute, or controlling caselaw such that he was "dispens[ing] his own brand of industrial justice." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671 (2010) (quoting Major League Baseball Players Ass'n. v. Garvey, 532 U.S. 504, 509 (2001) (per curiam)).  As the First Circuit has repeatedly recognized, "an FAA award cannot be overturned based on mere disagreement by the court with the panel on a debatable issue." Bangor Gas, 695 F.3d at 187

20

(citing Advest, 914 F.2d at 9).  Even if the Court were to agree that Payment Application #28 is not covered by the Act, it may not overturn the Arbitrator's legal interpretation so long as the Arbitrator was attempting to apply the law. See Oxford Health, 569 U.S. at 573 ("The arbitrator's construction holds, however good, bad, or ugly.").

### D.    Public Policy

Finally, Primoris argues that the award should be vacated on public policy grounds, asserting that it results in an impermissible forfeiture.[5]  Primoris contends that the Massachusetts Prompt Payment Act does not apply to Payment Application #28 because it was submitted after work was completed, and therefore does not constitute a periodic progress payment or a request to change the contract price.  Primoris argues, therefore, that the Arbitrator's award effectively created a "right to payment independent of the contract" that the Act does not authorize. [Dkt. 1-1 at 19].

Under the public policy exception, courts may vacate an arbitration award if enforcement would violate a "well defined and dominant" public policy. Union Internacional, 8 F.4th at 51. In making this assessment, courts examine "whether the award create[s] any explicit conflict with other 'laws and legal precedents'" rather than assessing "general considerations of supposed public interests." Prudential-Bache Sec., 72 F.3d at 241 (quoting United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 43 (1987)); Bos. Med. Ctr. v. SEIU, Loc. 285, 260 F.3d 16, 25 (1st Cir. 2001) (explaining that courts decline to vacate arbitration awards that "violate[] no specific provision of any law or regulation") (quoting E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 66 (2000)).  The scope of review is

---

[5] Primoris' Petition does not cite a particular constitutional provision, so the Court does not reach any constitutional claims such as those related to due process or freedom to contract.

"extremely narrow," and "examples of arbitration results that so offend public policy that they should be set aside by a court are not readily to be found." Am. Postal Workers Union v. U.S. Postal Serv., 789 F.2d 1, 8 (D.C. Cir. 1986); Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 665, 670 (11th Cir. 1988).  Like the manifest-disregard doctrine, the continued validity of the public policy ground for vacatur is under question after Hall Street. See Sanwan Tr. v. Lindsay, Inc., 251 F. Supp. 3d 353, 360 (D. Mass. 2017) (holding that public policy no longer remains a viable basis to vacate); Marks, 2026 WL 457749, at *2 (same).

Here, Primoris' argument fails because it essentially challenges the Arbitrator's statutory interpretation rather than invoking an "explicit" and "well defined and dominant" public policy. Union Internacional UAW, 8 F.4th at 51.  Of the legal authorities Primoris cites—including Mass. Gen. Laws ch. 149, § 29E (2010), legislative history, and caselaw—none state in so literal terms that applying the Massachusetts Prompt Payment Act to payment applications submitted after work is completed violates any particular public policy.  The authorities address only the deadlines for submitting periodic progress payments and requests seeking an increase in the contract price. [Dkt. 1-1 at 18].  As Primoris itself acknowledges, the public policy reflected in these provisions is to ensure that "contractors receive prompt payment, or prompt and complete notice of objections to payment requests," and thus are not left unpaid for an unreasonable period. [Id. at 18-19 (quoting Tocci, 2020 Mass. Super. LEXIS 152, at *17)].  It would be a stretch to interpret these provisions as expressing a public policy precluding application of the statute to payments solely on the basis of untimely submission; that is, if the purpose of the Act is to prevent contractors from being unwilling lenders for a project, it follows that some payment applications may be submitted after specific work has been completed, particularly where the parties dispute whether a Change Order Request should be approved.  Indeed, the record

22

suggests the untimeliness of A/Z's submission of Payment Application #28 was at least in part due to ongoing disputes with Primoris over whether compensation is justified, stemming as far back as February 2021. [Id. at 6; Dkts. 1-18 at 1; 1-19 at 1]. Accordingly, the Court finds that Primoris has not demonstrated that the Arbitrator's award should be vacated on public policy grounds.

### E.    Motion to Confirm Arbitration Award

In addition to Primoris' Petition, A/Z's Motion to Confirm is pending before the Court. Under Section 9 of the FAA, a court "must grant such an order [to confirm the award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA]." 9 U.S.C. § 9; Ebbe v. Concorde Inv. Servs., 392 F. Supp. 3d 228, 242 (D. Mass. 2019) ("In the absence of a reason to vacate, modify, or correct an arbitration award, a district court must confirm it."); see Hall St., 552 U.S. at 587 (noting that the language of Section 9 "carries no hint of flexibility" for "judicial confirmation" of an arbitration award). However, at the same time, a court cannot confirm or vacate an arbitration award until the award is final. See Ribadeneira, 65 F.4th at 14 ("[I]t is essential for the district court's jurisdiction that the arbitrator's award was final, not interlocutory.") (quoting Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231, 233 (1st Cir. 2001); El Mundo Broad. Corp. v. United Steelworkers of Am., AFL-CIO CLC, 116 F.3d 7, 9 (1st Cir. 1997)).

Here, a motion for reconsideration remains pending in the underlying arbitration. Because the arbitration order could conceivably be modified as a result of that motion, the Court finds that granting the Motion to Confirm at this stage would be premature. Accordingly, the Motion is stayed until the Arbitrator has granted or denied reconsideration. Should the Arbitrator deny reconsideration, the Court will promptly confirm the award, as required by 9 U.S.C. § 9.

23

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's Petition [Dkt. 1] is **DENIED**.  Defendant's Motion to Confirm [Dkt. 19] is **STAYED** pending the resolution of the motion for reconsideration filed in the underlying arbitration.  An administrative stay shall be issued.  The Parties are **DIRECTED** to confer with the Arbitrator regarding the status of the motion for reconsideration in light of this Court's Order on Primoris' Petition and to file a joint status report within **thirty (30) days** of this Order.

**SO ORDERED.**

Dated: March 18, 2026                                              /s/ Angel Kelley
                                                                            Hon. Angel Kelley
                                                                            United States District Judge

24